Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

Margot P. Cutter, SBN 306789
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
E-mail: mcutter@cutterlaw.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: 202-973-0900
E-mail: psilva@tzlegal.com

James Bilsborrow, *pro hac vice* to be filed
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-558-5500
E-mail: jbilsborrow@weitzlux.com

[Additional Counsel on Signature Page]

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN BELTRAN, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FANDUEL, INC., FANDUEL LIMITED, FLUTTER ENTERTAINMENT PLC, AND DOES 1-10,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded** |

-1-

1.      Plaintiff Martin Beltran brings the following allegations on behalf of himself and all others similarly situated, based on his personal knowledge as to the facts pertaining to Plaintiff, and based on the investigation of counsel and information and belief as to all other allegations:

## I.      INTRODUCTION

2.      Since at least 2015, FanDuel,[1] the self described "#1 Sportsbook and the premier mobile sports betting operator in the U.S.,"[2] has been operating mobile gambling applications and websites within California (collectively, the "Gambling Websites"), representing to customers and the public that its daily fantasy sports contests, often branded as "FanDuel Fantasy," are legal forms of gambling in California. They are not.

3.      Plaintiff Martin Beltran on behalf of himself and the proposed class of similarly situated Californians, brings this lawsuit to stop the unlawful gambling that occurs on FanDuel's Gambling Websites in California and to recover the money that FanDuel has unlawfully taken from them.

## II.      PARTIES

**A.      Plaintiff.**

4.      At all times relevant to this action, Plaintiff Martin Beltran was over the age of 18 and is a resident of Contra Costa County, California.

**B.      Defendants.**

5.      Defendant FanDuel, Inc. is identified in the FanDuel Terms of Use as an operator of the Gambling Websites.[3] FanDuel Inc. is a Delaware corporation with its headquarters in New York, New York. FanDuel, Inc. regularly conducts business within California and this District, including by running the Gambling Websites that are the subject of this litigation.

---

[1] "FanDuel" refers collectively to defendants FanDuel, Inc., FanDuel Limited, and Flutter Entertainment PLC.

[2] https://www.fanduel.com/about (last visited June 30, 2025).

[3] "FanDuel, Inc. and FanDuel Limited (collectively, 'We', 'Us', or 'FanDuel') provide a fantasy sports website located at fanduel.com (the 'Site') and related mobile apps." FanDuel Fantasy Terms of Use dated April 28, 2025, available online at https://www.fanduel.com/terms (last visited June 30, 2025).

6.     FanDuel Limited is identified in the FanDuel Terms of Use as an operator of the Gambling Websites.[4] Upon searching the California Secretary of State Business Lookup Tool,[5] FanDuel Limited does not appear to be registered with the California Secretary of State. FanDuel Limited is incorporated in the United Kingdom with its US-based headquarters located in New York, New York.

7.     Flutter Entertainment PLC is the parent company of FanDuel, Inc. and is an Irish corporation with its US-based headquarters in New York, New York. Upon searching the California Secretary of State Business Lookup Tool,[6] FanDuel Limited does not appear to be registered with the California Secretary of State.

8.     On information and belief, Does 1-10 are individuals and/or entities who facilitate FanDuel's unlawful practices described in this Complaint. The identities of Does 1-10 are not presently known to Plaintiff. The Doe defendants, along with defendants FanDuel, are collectively referred to in this Complaint as "Defendants."

9.     Plaintiff expressly reserves his right to amend this Complaint to add the Doe defendants by name, once their identities are known.

## III.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     The United States District Court for the Northern District of California has personal jurisdiction over the parties in this matter because Plaintiff Beltran resides in Contra Costa County and Plaintiff Beltran also resides in Contra Costa County.  FanDuel regularly conducts business

---

[4] "FanDuel, Inc. and FanDuel Limited (collectively, 'We', 'Us', or 'FanDuel') provide a fantasy sports website located at fanduel.com (the 'Site') and related mobile apps." FanDuel Fantasy Terms of Use dated April 28, 2025, available online at https://www.fanduel.com/terms (last visited June 30, 2025).

[5] https://bizfileonline.sos.ca.gov/search/business (last visited June 30, 2025).

[6] https://bizfileonline.sos.ca.gov/search/business (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

within this District, including by engaging in the unlawful gambling practices that are at the center of this action.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Plaintiff Beltran resides in Contra Costa County, and FanDuel's unlawful actions, which are the subject of this action, occurred in Contra Costa County, among other locations within California.

13.     Pursuant to California Civil Code Section 1780(d), a declaration from Plaintiff Beltran is attached as **Exhibit A** confirming that venue is proper.

### IV.     DIVISIONAL ASSIGNMENT

14.     Pursuant to Local Rules 3.2(c) and 3.5(b), Plaintiff Beltran further states that assignment to the San Francisco and Oakland Division of this Court is proper because Plaintiff Beltran resides in Contra Costa County, and many of the events at issue in this lawsuit occurred in Contra Costa County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

### V.     FACTUAL ALLEGATIONS

**A.     California's Longstanding Ban on Gambling.**

15.     For over 150 years, California has broadly prohibited commercialized gambling.

16.     For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

17.     A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id. at* 679.

18.     Similarly, California Penal Code Section 337a prohibits additional conduct, including:

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- *"[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money* . . . *staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever." Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever." Id.* at (a)(4) (emphasis added).

- *"[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*." Id.* at (a)(6) (emphasis added).

19. The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

20. Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser

-5-

will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest."  CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[7]

21.    "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

22.    Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any contest and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons, such as in fantasy sports.[8]

23.    Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

24.    For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[9] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor."[10] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or

---

[7] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited June 30, 2025).

[8] While Section 337a violations are reduced to infractions in certain circumstances for non-commercial gambling in amounts below $2,500, the Section 337a reductions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[9] CAL. PENAL CODE § 320.

[10] CAL. PENAL CODE § 321.

chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

25.    Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

26.    And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law*." CAL. PENAL CODE § 337j. (emphasis added).

27.    In fact, as the California legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

**B.    Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.**

28.    In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

29.    **Proposition 26** was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.
- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.
- Established certain taxes and fees associated with sports betting.

30.    Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

31.    **Proposition 27** aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that

"the industry ultimately spent $150 million on political ads"[11] in an attempt to legalize online gambling in California.

32.    Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.
- Established a new division within the California Department of Justice to set license requirements and oversee the industry.
- Imposed a 10% tax on sports betting revenue and established licensing fees.
- Allocated revenue from online gambling to homelessness prevention.

33.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

**C.    California's Ongoing Investigation into Daily Fantasy Sports Betting.**

34.    Despite the resounding defeats at the ballot box, online sports betting operators, like FanDuel, have continued to operate in California.

35.    In particular, "daily fantasy sports" betting has proliferated in the state.

36.    Daily fantasy sports, which are often referred to by the abbreviation "DFS," are a subset of fantasy sports games that are generally played online through gambling websites:

> As with traditional fantasy sports games, [in daily fantasy sports], players compete against others by building a team of professional athletes from a particular league or competition while remaining under a salary cap, and earn points based on the actual statistical performance of the players in real-world competitions.
>
> Daily fantasy sports are an accelerated variant of traditional fantasy sports that are conducted over short-term periods, such as a week or single day of competition, as opposed to those that are played across an entire season.
>
> Daily fantasy sports are typically structured in the form of paid competitions typically referred to as a "contest"; winners receive a

---

[11] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

share of a pre-determined pot funded by their entry fees. A portion of entry fee payments go to the provider as rake revenue.[12]

37.    According to the California Business Journal, "California residents are estimated to contribute as much as 10% of the total entries in DFS contests nationwide. This popularity has translated into substantial revenue, with DFS platforms raking in approximately $200 million in entry fees annually [in California]."[13]

38.    In response to these massive ongoing daily fantasy sports betting operations in California, on or about October 5, 2023, State Senator Scott Wilk wrote to the California Department of Justice and requested an investigation into daily fantasy sports betting:

> I write to request a legal opinion as to whether California law prohibits the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State.
>
> Pursuant to California law, no one may operate "any game of chance" without the required federal, state, and local licenses. No one has "the right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."
>
> In 2022, California voters overwhelmingly rejected Proposition 27 to legalize online sports wagering. Although sports wagering in all forms remains illegal in California, online daily fantasy sports betting is proliferating throughout the state. Through these online platforms, a participant pays to enter a contest in which they may win a prize depending on how well athletes perform. Although the participant may utilize their knowledge of a particular sport in choosing their "team" of players, how well those players perform during a game is completely out of the participant's control. As such, *daily fantasy sports appears to be a game of chance not otherwise permitted by the laws of California.*

(Cleaned up; footnotes omitted; emphasis added).[14]

---

[12]    *Daily Fantasy Sports,* Wikipedia, available online at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited June 30, 2025).

[13] *Unfenced Playground: A Peek into California's Daily Fantasy Sports Landscape, California Business Journal,* available online at https://calbizjournal.com/unfenced-playground-a-peek-into-californias-daily-fantasy-sports-landscape/#:~:text=In%20fact%2C%20California%20residents%20are,million%20in%20entry%20fees%20annually (last visited June 30, 2025).

[14]    A copy of the letter is publicly available online at https://www.legalsportsreport.com/wp-content/uploads/2023/11/OU-23-1001-Sen.-Wilk-request-1.pdf  (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

39.     Consistent with the Senator's request, the California Department of Justice directed the Attorney General's Opinion Unit to address the following question:

> Does California law prohibit the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State?

Opinion Request No. 23-1001.[15]

40.     Online sports betting operators are well aware of the pending opinion, having submitted materials to the Attorney General's Office arguing for the supposed legality of the practices. Many other entities, including Native American Tribes, have submitted materials to the Attorney General's office showing the unlawful nature of the practices.

41.     As of the time of the filing of this lawsuit, no opinion has been issued from the Attorney General's Office.[16]

**D.      FanDuel's California Fantasy Sports Gambling Operations.**

42.     FanDuel has been operating in California since at least 2015 through the Gambling Websites, which consist of at least the FanDuel mobile apps for Android and IOS and the FanDuel website, FanDuel.com, and associated subpages. The primary gambling product that FanDuel currently offers in California is "FanDuel Fantasy." FanDuel represents to its customers that "FanDuel Fantasy" is legal in the state. It is not.

/ / /

/ / /

/ / /

---

[15] Available online at https://oag.ca.gov/opinions/monthly-report (last visited July 2, 2025).

[16] Plaintiff's counsel have "subscribed" to the Legal Opinions of the Attorney General Monthly Opinion Report and understand that they will receive an email notification once an opinion issues. Plaintiff's counsel will promptly notify the Court regarding any relevant updates they receive.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1. **Daily Fantasy Sports.**

    a. **Traditional Daily Fantasy Sports.**

43.    A fantasy sport is a game where participants assemble imaginary teams composed of real professional sports players. These imaginary teams "compete" based on the statistical performance of those players in actual games, such as rushing yards, receiving yards, or points scored. This performance is converted into points that are compiled and totaled according to rules agreed to amongst the players.[17]

44.    Traditional fantasy sports were played with friends and family over the course of a sports season, for small amounts of money or for no money at all.

45.    In traditional fantasy games involving money, one participant may have held money for the group to payout at the end of the season, but all participant money was distributed to other players (and not any third-party) at the end of the season.[18]

/ / /

/ / /

/ / /

---

[17] *See generally, Daily Fantasy Sports,* Wikipedia, available online at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited June 30, 2025).

[18] This type of non-commercialized, small scale fantasy sports betting is excluded from many of the criminal law prohibitions discussed in Section A, above. *See also* Cal. Penal Code § 336.9(b)(1).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

b.    **The Daily Fantasy Sports Gambling Products Offered by FanDuel in California.**

46.    The primary gambling product that FanDuel currently offers in California is "FanDuel Fantasy." According to FanDuel's website, a user plays FanDuel Fantasy by "Draft[ing] your fantasy team in just a few simple steps. Build[ing] a new team for every contest. Every player has a price, just choose the players you want while staying under the salary cap. FanDuel is more than fantasy football. There's something for every fan. We also have contests for fantasy hockey, fantasy NASCAR, fantasy golf and more! Play against your friends or against everyone, with no season-long commitment."[19]

47.    On the Gambling Websites, FanDuel provides the following step-by-step guidance on how to enter a FanDuel Fantasy contest:[20]



---

[19] https://www.fanduel.com/legal-sports-betting-us-map (last visited June 30, 2025).

[20] https://www.fanduel.com/daily-fantasy-sports (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

48. Further down on the page, FanDuel identifies a number of Fantasy betting contest types, including:[21]

## TYPES OF CONTESTS

**TOURNAMENTS**
Our largest tournaments with large, guaranteed prize pools

**BEGINNER CONTESTS**
Learn the ropes by competing against other new players

**FULL ROSTER**
Draft a lineup with players across a slate of games

**SINGLE GAME**
Draft a lineup with players from one game

**FRIENDS MODE**
Play against your friends in a full-season league or a one-day contest

**SNAKE DRAFT**
Take turns picking players in a live draft

**BEST BALL**
Play season-long fantasy with no roster management

**MULTIPLIERS**
Double your money or play for even more

**H2H**
Winner-take-all! Compete head-to-head against a single opponent

**3-100 PLAYERS**
Compete against a smaller field

**50/50s**
Finish in the top half of the leaderboard to win!

**SATELLITES & QUALIFIERS**
Play to win entries into other contests that feature large prize pools and other prizes!

---

[21] FanDuel also purports to offer a "free-to-play" option. Only contests where wagers or bets are made for items of value are at issue in this lawsuit. Accordingly, if the "free-to-play" option is actually free, it is outside the scope of Plaintiff's claims.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

49.     Regardless of which FanDuel Fantasy contest type is selected, each contest has the same basic structure—users place bets with FanDuel regarding the expected future actual performance of athletes (i.e., in the underlying sporting games). FanDuel collects the sums bet and wagered by users and pools the bets and wagers together into a "prize pool." FanDuel records the bets on its ledger (i.e., its "betting book"). The underlying sporting event occurs "in real life" (i.e., at the relevant sporting arena(s)). FanDuel uses its records and the records from the sporting event(s) to determine the outcome of the "fantasy" contest. FanDuel pays out the winners from the prize pool. And finally, FanDuel determines the share of the prize pool of bets that it keeps.

50.     For example, here are two examples of "Single Game Tournament" Fantasy contests that FanDuel was offering in California on June 28, 2025:



51.     In the first example, users are presented the option to bet on WNBA players who are competing in the Washington versus Dallas basketball game. Users were required to bet at least $9 to participate, with 529 participants expected to enter the betting pool. As a result, the total prize pool collected by FanDuel for the contest was $4,761. Despite pooling $4,761 in bets, FanDuel elected to only make $4,000 of the pooled bets available to payout as winnings, taking a rake of 19% of total wagers.

52.     Similarly, in the second example, users are presented the option to bet on the same basketball game. Once again, users were required to bet at least $9 to participate, but the expected total entry population decreased to 264 participants. As a result, the total prize pool of bets collected

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

by FanDuel was $2,376. Despite pooling $2,376 in bets, FanDuel elected to only make $2,000 of the pooled wagers available to payout as winnings, taking a rake of 18.8% of funds bet.

53.    Here are several additional FanDuel Fantasy game types that were offered on June 28, 2025:



54.    Looking at the fourth option down "1K Sat MLB Grand Glam" contest, the FanDuel Fantasy contest features a 6:30 PM baseball game between the Washington Nationals and the Los Angeles Angels, with the Angels playing at home in Anaheim, California. Users were required to bet at least $33 to participate, with an expected 35 participants. As a result, the total betting prize pool collected by FanDuel was $1,155. Despite pooling $1,155 in bets, FanDuel elected to only make $1,000 of the pooled funds available to payout winning bets, taking a rake of about 11.5%.

/ / /

/ / /

/ / /

55.    The same basic structure remains true when FanDuel fantasy bets are placed on the FanDuel Fantasy apps:



56.    For example, looking at the third option down on the image above, the "MLB Full Roster" contest, users were required to bet at least $2 to participate, with an expected 11 participants. As a result, the total prize pool collected by FanDuel was $222. Despite pooling $222, FanDuel elected to only make $200 of the pooled wagers available to payout winning bets, taking a rake of about 11%.

57.    Put simply, while the specific bet and wager amounts, number of participants, total betting funds pooled, payouts made, and funds retained by FanDuel vary from fantasy contest to fantasy contest, the same basic betting structure remains: users place bets with FanDuel regarding the expected future actual performance of athletes (i.e., in the underlying sporting games). FanDuel collects the sums wagered by users and pools the bets together into a "prize pool." FanDuel records

-16-

the bets on its ledger (i.e., its "betting book"). The underlying sporting event occurs "in real life" (i.e., at the relevant sporting arena(s)). FanDuel uses its records and the records from the sporting event(s) to determine the outcome of the "fantasy" contest. FanDuel pays out the winners from the prize pool. And finally, FanDuel determines the share of the prize pool of bets that it keeps.

**c.    FanDuel Daily Fantasy Is Different from Traditional Fantasy Sports in Many Important Ways.**

58.    Moreover, as the examples shown above reflect, there are many critical differences between FanDuel Fantasy gambling contests and traditional fantasy sports.

59.    First, unlike traditional fantasy sports that are played between friends and family, FanDuel Fantasy sets up contests between strangers through its Gambling Websites.[22] Many of the FanDuel Fantasy contests offered include hundreds or thousands of participants, as compared to traditional fantasy sports, that might have had around a dozen participants.

60.    Second, unlike traditional fantasy sports, in FanDuel Fantasy, FanDuel receives, pools, documents (i.e., books), and holds all participant bets and wagers until the end of the contest, when FanDuel uses its records (i.e., FanDuel's betting book) to distribute a portion of the pooled bets and wagers to the winner(s).

61.    Third, unlike traditional fantasy sports, in FanDuel Fantasy, FanDuel takes a portion of each pool of bets and wagers, even though it is not a participant in the contest.

62.    Fourth, unlike traditional fantasy sports, in FanDuel Fantasy, the size of the bets and wagers, the number of participants, the pool size of bets and wagers, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by FanDuel are all set by FanDuel.

63.    Fifth, unlike traditional fantasy sports, in FanDuel Fantasy, the size of the bets and wagers, the number of participants, the pool sizes of bets and wagers collected, the prize pools

---

[22] In certain limited instances, it appears that users can play against individuals they know, but on information and belief, such transactions make up only a small portion of all FanDuel California-based bets.

made available as "winnings," and the portions of the bets, wagers, and pools kept by FanDuel vary dramatically, even when betting on the same underlying professional sporting event.

64.     Sixth, unlike traditional fantasy sports, in FanDuel Fantasy, FanDuel maintains records of all bets and wagers placed on FanDuel Fantasy, and uses those records (i.e., the betting books) to calculate post-contest payouts to participants from the pool of bets and wagers.

65.     Seventh, unlike traditional fantasy sports, which generally last throughout an entire sports season (e.g., the NFL regular football season), FanDuel Fantasy generally involves short periods of participation and are designed to entice multiple rounds of repeat betting over the course of a day, a weekend, or a week.[23]

66.     Finally, unlike traditional fantasy sports, in FanDuel Fantasy, FanDuel offers users the opportunity to enter contests across a multitude of sporting types at the same time. For example, in June 2025, FanDuel offered its Fantasy contests for MLB, the WNBA, the NBA, and NASCAR, among others.

67.     Ultimately, regardless of which FanDuel Fantasy contest-type users select, they have no control over the outcome of the fantasy game they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performances in the actual real life sporting events) and are entirely outside the control of the users of FanDuel Fantasy.[24]

68.     Moreover, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player

---

[23] In fact, online sports betting operators are facing lawsuits across the country related to the addictive nature of their online betting platforms. While those claims are not directly at issue in this lawsuit, because California law categorially prohibits FanDuel Fantasy under the Penal Code, the California legislature has also expressly noted the addictive nature of gambling: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c).

[24] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by FanDuel constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

may have selected the [same winning combination on] a particular day." *Finster*, 18 Cal. App. 3d at 845.

69.    Put simply, the outcomes of the FanDuel Fantasy contests are contingent and unknown at the time the bets and wagers are made, collected, recorded (i.e., booked), and pooled by FanDuel. And as a result, FanDuel's Fantasy contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

**2.    FanDuel Solicits California Users Through a Comprehensive Advertising Campaign that Is Directed at California Consumers.**

70.    Online fantasy sports bet operators spend billions of dollars each year on advertising and marketing,[25] with MediaRadar reporting that FanDuel alone spends about a half-billion dollars each year.[26]

71.    The reason FanDuel spends hundreds of millions of dollars each year on advertisements and marketing is to expand and maintain its userbase, including within California, which is the largest daily fantasy market in the country.

72.    For example, FanDuel runs extensive traditional TV advertisements (including within California) featuring celebrities and promotional offers to attract new customers. One recent "viral" example is the FanDuel "Kick of Destiny 2" commercial[27] featuring Rob Gronkowski during the 2024 Super Bowl.  In the commercial, Gronkowski attempted a live field goal with $10 million in bonus bets on the line for FanDuel customers. The commercial built on a previous 2023 "Kick of Destiny" campaign[28] where Gronkowski missed his attempt.

---

[25] *How Much Sportsbooks Spend on Marketing (2025 Updated Stats!),* available online at https://www.scaleo.io/blog/how-much-sportsbooks-spend-on-marketing-2024-updated-stats/ (last visited June 30, 2025)

[26]https://www.mediaradar.com/blog/blog/q4-2023-12-for-24-gambling (last visited June 30, 2025); *see also Daily Fantasy Sports: Last Week Tonight,* available online at https://www.youtube.com/watch?v=Mq785nJ0FXQ (last visited June 30, 2025) (documenting extent of FanDuel and related companies' advertising).

[27] Available online at https://www.youtube.com/watch?v=bXrhgATNVbE (last visited June 30, 2025).

[28] Available online at https://www.youtube.com/watch?v=cjiPkaGdbAQ (last visited June 30, 2025).

-19-

73.    And in the lead up to the 2025 Super Bowl, FanDuel continued to build on the campaign, this time instead featuring Peyton and Eli Manning.[29]

74.    Similarly, FanDuel's recently ran a TV ad featuring Charles Barkley focused on betting on the NBA leading up to and during the 2025 NBA finals.[30]

75.    Dozens of additional similar commercials are archived on FanDuel's official YouTube channel, which is available online at https://www.youtube.com/@FanDuel/videos.

76.    In addition to TV ads, FanDuel also engages in extensive sponsorships and partnerships. Here are some of the relationships featured on the FanDuel website, including with MLB, NASCAR, the NBA, and the NFL:[31]



---

[29] https://www.youtube.com/watch?v=aBCEHatSaYI (last visited June 30, 2025).

[30] https://www.youtube.com/watch?v=L3kUtHtwkPw (last visited June 30, 2025).

[31] https://press.fanduel.com/our-company/partners (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

77.    Other advertising mediums used by FanDuel include online ads, social media ads, and ads placed on podcasts.

78.    FanDuel also extensively features promotions and referral programs to engage new and existing customers:[32]



79.    Put simply, FanDuel has a comprehensive marketing and customer solicitation strategy, that includes soliciting new and existing customers to use FanDuel, including within California.

80.    Those ads work, with hundreds of thousands (if not millions) of Californians using FanDuel's Gambling Websites to place bets and wagers on FanDuel Fantasy contests.

---

[32] https://www.fanduel.com/daily-fantasy-sports (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**3.     Once Potential Customers Arrive on the FanDuel Gambling Websites, They Are Repeatedly Assured that FanDuel Is Lawfully Operating in California.**

81.     Well aware that customers would otherwise refuse to play its daily fantasy sports contests if they knew and understood those contests violated California criminal law, on its website, FanDuel repeatedly assures prospective customers that daily fantasy sports generally and FanDuel specifically are permitted in California.

82.     For example, on the main FanDuel landing page, FanDuel.com, one of the first sections a user encounters is entitled "Where can I play," which features a map showing that FanDuel Fantasy is available in California (among many other states):



83.     As FanDuel further explains on a related webpage, the "legalization of sports gambling in America is advancing at different rates in different states. Is FanDuel available in your state for legal sports betting online, retail wagering at the sportsbook counter, or both? Here's a guide to the current status and availability of FanDuel in every U.S. state."[33]

---

[33] https://www.fanduel.com/legal-sports-betting-us-map (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

84.    Further, in contrast to its representations that FanDuel Fantasy is permitted and available in California, many other landing pages for other FanDuel products reflect that those other products are not legal in California. For example, here is the "Sports Betting" map and representations, showing that the "Sports Betting" FanDuel product is not legal in California: [34]



85.    Further, California users attempting to access the FanDuel "Sports Book" are directed by FanDuel to instead play FanDuel Fantasy in the "meantime," reinforcing the impression that FanDuel Fantasy is already legal in California and that FanDuel is ensuring legal compliance:[35]



86.    Further, if a user attempts to explore the Gambling Websites before creating an account, he is expressly blocked from seeing many webpages until location sharing information is authorized, and once an account is created, location sharing is required in order to place bets.

87.    These location sharing requirements lead users to understand and expect that FanDuel, "America's #1 Sportsbook and the premier mobile sports betting operator in the U.S.,"[36] is monitoring location information in order to ensure legal compliance by users.

---

[35] https://www.fanduel.com/legal-sports-betting-us-map (last visited June 30, 2025).

[36] https://www.fanduel.com/about (last visited June 30, 2025).

88. Moreover, throughout the Gambling Websites, FanDuel identifies different ages by state where customers can utilize the gambling products. For example, in the FanDuel Fantasy "Rules,"[37] FanDuel represents that the age requirements to participate in Fantasy vary by state:



89. Tellingly, while FanDuel expressly disclaims that it's providing any legal representations as to legality in Texas, it makes no such limitation with regard to California.

90. Put simply, combined with FanDuel's affirmative representations about where FanDuel Fantasy is permitted, these repeated representations lead users to understand that FanDuel, has carefully reviewed the gambling laws of California and other states and concluded that certain products are lawful in California and others are not, and that FanDuel is only offering the legal products.

91. Plaintiff's and the Class's (as defined below) reliance on such representations from FanDuel, "America's #1 Sportsbook and the premier mobile sports betting operator in the U.S.,"[38] were entirely reasonable, as FanDuel effectively holds itself out as an expert on the nuances of gambling law and regulation across the United States.

/ / /

/ / /

/ / /

---

[37] https://www.fanduel.com/rules (last visited June 30, 2025)

[38] https://www.fanduel.com/about (last visited June 30, 2025).

-25-

92.   Similar representations are made on the mobile apps, for example:








CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

93.     Put simply, FanDuel intentionally and strategically leads—in fact, misleads—consumers into believing that its operation of the Gambling Websites in California is legal.

94.     It is not.

**E.      Plaintiff's Experiences.**

95.     Plaintiff Martin Beltran is a lifelong California resident, currently living in Contra Costa County, California.

96.     Several years ago, in response to advertisements he had seen on television, Plaintiff Beltran created an account with FanDuel. FanDuel represented to Plaintiff Beltran that the products and services it offered in California were legal, including by displaying a map at the end of TV commercials showing which jurisdictions FanDuel was authorized and legal to gamble in. The map showed California as an approved and legal jurisdiction.

97.     Since that time, FanDuel has continued to represent to Plaintiff Beltran, including on the Gambling Websites themselves, that its services are legal in California.

98.     In setting up and using his FanDuel account, Plaintiff Beltran expressly relied upon FanDuel's representations that the services it provides in California are legal.

99.     If FanDuel had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Beltran would not have created an account with FanDuel in California and would not have placed bets while in California through FanDuel's Gambling Websites.

100.    Since creating his account, Plaintiff Beltran has lost more than $200 to FanDuel while in California.

101.    If FanDuel had not solicited bets and wagers from Plaintiff Beltran while representing that such activities were legal (when, unknown to Plaintiff Beltran at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to FanDuel.

102.    Among other gambling options offered by FanDuel in California, Plaintiff Beltran specifically recalls placing several bets with FanDuel during the 2024 NFL season and losing money on each of those bets to FanDuel.

-27-

103.    In Plaintiff Beltran's experience, FanDuel operates its Fantasy contests on a "pooled" or "percentage" model, where FanDuel collects bets and wagers from each user, records those bets and wagers (i.e., creates betting slips and a "betting book"), pools those bets and wagers into a "prize pool," uses its records (i.e., the betting book) to determine "winners" and "losers," and eventually pays out the winner(s) from the pooled funds and keeps a portion or percentage of the bets and wagers for itself as a "rake."

104.    While Plaintiff Beltran has now discontinued the use of FanDuel while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Beltran may be tricked by FanDuel in the future into engaging in unlawful gambling in California if FanDuel continues to claim that its practices are legal.

105.    Plaintiff Beltran's sole reason for setting up an account with FanDuel and purportedly consenting to FanDuel's terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation) was to gain access to the gambling services in California offered by FanDuel that he now understands violate California law.

106.    Said differently, to the extent a contract was formed between Plaintiff Beltran and FanDuel, the sole purpose of that contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

107.    Accordingly, Plaintiff Beltran's contract with FanDuel (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to any express provision of the law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

**F.    Plaintiff's Claims Are Not Subject to Arbitration.**

108.    Plaintiff Beltran's sole reason for setting up an account with FanDuel and purportedly consenting to FanDuel's terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the gambling services in California offered by FanDuel that he now understands violate California law.

109.    Said differently, to the extent a contract was formed between Plaintiff and FanDuel, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

110.    Accordingly, Plaintiff's contract with FanDuel (to the extent any such contract was otherwise ever formed) is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."[39]

111.    Moreover, even if a valid contract were otherwise formed (it was not) and was enforceable (it is not), under the plain terms of that supposed contract, numerous matters that are at issue in this action are excluded from arbitration and must be resolved by this Court *first* before any claims can be arbitrated:

> Notwithstanding the parties' decision to resolve all disputes through arbitration . . . [e]ither party may also seek a declaratory judgment or other equitable relief in a court of competent jurisdiction regarding whether a party's claims are time-barred or may be brought in small claims court . . . . [A]ny filed arbitrations related to any action filed pursuant to this paragraph shall automatically be stayed (and any applicable statute of limitations tolled) pending the outcome of such action.[40]

112.    Here, among other things, in their Third Cause of Action (below), Plaintiff, on behalf of himself and the Class (as defined below), seek a declaratory judgment: (1) that FanDuel's operation of the Gambling Websites within California, including FanDuel Fantasy, violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j; (2) that FanDuel's contracts with Plaintiff and the Class (to the extent any were formed) are void or voidable, including, without limitation, pursuant to California Civil Code Section 1667; (3) determining the

---

[39] Plaintiff expressly reserves his right to contest the FanDuel Terms of Service on additional and separate grounds in response to any motion brought by FanDuel or otherwise.

[40] Fan Duel Terms of Use Dated April 28, 2025 at ¶ 18.3, available online at https://www.fanduel.com/terms (last visited June 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

applicable statute of limitations for claims raised by Plaintiff and the Class;[41] and (4) finding that Plaintiff and the Class cannot be required to pursue their claims in small claims court.

**G.    FanDuel's Affirmative Misrepresentations Have Tolled the Statute of Limitations.**

113.    As detailed above, FanDuel has consistently and explicitly represented to the public and its customers, including Plaintiff and the Class (as defined below), that its operation of the Gambling Websites in California is permissible and legal.

114.    Among other things, FanDuel has held itself out as an authority on gambling law and regulations, and induced Plaintiff and the Class to rely on its affirmative false representations and statements in order to secure Plaintiff's and the Class's use of the Gambling Websites and to keep Plaintiff and the Class using the unlawful Gambling Websites in California.

115.    As a direct and proximate result of FanDuel's affirmative misrepresentations and statements, Plaintiff and the Class had no reason to believe that operation of the Gambling Websites was unlawful. In fact, just the opposite. They trusted and relied upon the purported expertise of FanDuel, "America's #1 Sportsbook and the premier mobile sports betting operator in the U.S.,"[42] in California gambling law and regulation.

116.    Plaintiff and the Class were unable to discover—and in fact, did not discover—the true and unlawful nature of the Gambling Websites on their own, as, on information and belief, FanDuel and others in the online gambling industry have inundated the internet and other publicly available resources (e.g., news articles and legal blogs) with claims that daily fantasy sports betting contests and other betting contests are legal in California.

117.    When Plaintiff did finally learn the true unlawful nature of the Gambling Websites' operation in or about July of 2025, Plaintiff promptly filed this lawsuit.

---

[41]In its Terms of Use, FanDuel contends that any claims against it are subject to a one-year statute of limitation period. Fan Duel Terms of Use Dated April 28, 2025 at ¶ 18.3, available online at https://www.fanduel.com/terms (last visited June 30, 2025). Plaintiff, as detailed in Section V.G below, contend that all statutes of limitations periods have tolled, and alternatively, Plaintiff states that the applicable statute of limitations period is four years for claims arising under California's unfair competition law (First Cause of Action, below) and three years for claims arising under California's Consumer Legal Remedies Action (Second Cause of Action, below), not one year, as claimed by FanDuel. Accordingly, a present dispute exists between Plaintiff and FanDuel as to the applicable limitations period.

[42] https://www.fanduel.com/about (last visited June 30, 2025).

**H.    FanDuel Acted with Malice, Oppression, and Fraud.**

118.    As detailed in this Complaint, FanDuel has acted with malice, oppression, and fraud.

119.    FanDuel acted with malice, because, among other reasons and as otherwise detailed in this Complaint, FanDuel's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiff, and the Class (as defined below) because FanDuel knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiff and the Class to gamble and lose money through its Gambling Websites while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

120.    FanDuel's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiff and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that FanDuel held out as being legal in California.

121.    FanDuel's conduct was fraudulent, because, among other reasons and as otherwise detailed in this Complaint, FanDuel intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiff and the Class by affirmatively representing that the Gambling Websites and associated contests were permissible and legal in California when FanDuel knew (or should have known) that such contests were not.

**I.    Plaintiff and the Class Lack an Adequate Remedy at Law.**

122.    Plaintiff and the Class (as defined below) have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and Class are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. As such, the Court may award restitution even if it determines that

-31-

Plaintiff and the Class fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

123.    Equitable relief is appropriate because Plaintiff and the Class may lack an adequate remedy at law if, for instance, damages resulting from their use of the Gambling Websites is determined to be an amount less than paid to use the Gambling Websites. Without compensation for the full amount paid, Plaintiff and the Class would be left without the remedy they are entitled to in equity.

## VI.    CLASS ALLEGATIONS

124.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

125.    Plaintiff seek certification of the following class (the "Class"):

> All California residents who placed a bet or wager on the Gambling Websites while in California.

126.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

127. FanDuel's practices have resulted in actual injury and harm to Plaintiff and Class members in the amount of deposits made with FanDuel and/or losses incurred on the Gambling Websites for bets or wagers placed while in California.

128. Plaintiff explicitly reserves his right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

129. **Numerosity.** Plaintiff is informed and believes that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of FanDuel.

130. **Commonality.** FanDuel has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on FanDuel and/or Plaintiff and the Class. Numerous common issues of fact and law exist, including, without limitation:

    a. What gambling contests FanDuel offers in California.

    b. What mediums (e.g., website, app, in person, etc.) FanDuel offers its gambling contests through in California.

    c. The dates and number of gambling contests offered by FanDuel in California.

    d. Whether FanDuel violates California Penal Code Section 319 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

    e. Whether FanDuel violates California Penal Code Section 320 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

    f. Whether FanDuel violates California Penal Code Section 321 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

g.      Whether FanDuel violates California Penal Code Section 330 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

h.      Whether FanDuel violates California Penal Code Section 330a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

i.      Whether FanDuel violates California Penal Code Section 337a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

j.      Whether FanDuel violates any additional sections of the California Penal Code or other applicable California law and/or regulation by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

k.      Whether FanDuel's violations of the California Penal Code give rise to liability under California's unfair competition law.

l.      Whether FanDuel is a "person" within the meaning of Section 1761(c) of the California Consumer Legal Remedies Act ("CLRA").

m.      Whether Plaintiff and Class members are "consumers" within the meaning of Section 1761(d) of the CLRA.

n.      Whether FanDuel's practices violate the following CLRA Sections, among others:

    i.      "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

    ii.      "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

    iii.      "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have

-34-

or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

        iv.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

        v.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

        vi.    "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

        vii.    "Inserting an unconscionable provision in the contract" (a)(19).

o.    Whether FanDuel's operation of the Gambling Websites should be enjoined in California.

p.    The appropriate monetary model for calculating equitable restitution and/or equitable disgorgement.

q.    Whether FanDuel's affirmative misrepresentations that the Gambling Websites are legal tolled any otherwise applicable statutes of limitations.

r.    Whether any subset of claims held by the Class are barred by the statute of limitations.

s.    Whether FanDuel's Terms of Service are valid and enforceable.

t.    Whether Plaintiff and the Class can be forced to pursue their claims in small claims court.

131.   **Predominance.** These common issues predominate over individualized inquiries in this action because centers around conduct that FanDuel engaged in and/or legal conclusions from such conduct, and FanDuel's liability for its actions can be established as to all members of the Class as discussed herein.

132.    **Typicality.** Plaintiff's claims against FanDuel and experience with FanDuel are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiff's claims arise from FanDuel's practices that are applicable to the entire Class.

133.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money to FanDuel. Plaintiff also has no interests antagonistic to those of the Class, and FanDuel has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the Class.

134.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to receive equitable monetary relief; the equitable monetary relief suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

135.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VII.    CAUSES OF ACTION

**A.    First Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, ("UCL") on Behalf of Plaintiff and the Class.**

136.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 135, inclusive, of this Complaint.

137. FanDuel, Plaintiff, and Class are "persons" within the meaning of the UCL.

138. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

139. FanDuel's practices of operating the Gambling Websites within California are "unlawful" within the meaning of the UCL because, among other things, the operation of the Gambling Websites violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j because, among other reasons, in the course of business and in the course of trade and commerce, FanDuel has:

    a. Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating the Gambling Websites and FanDuel Fantasy contests in California.[43]

    b. Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating the Gambling Websites and FanDuel Fantasy contests in California.

    c. Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating the Gambling Websites and FanDuel Fantasy contests in California.[44]

    d. Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating the Gambling Websites and FanDuel Fantasy contests in California.

    e. Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or

---

[43] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by FanDuel constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

[44] Plaintiff expressly states his allegations of "pool selling" as an alternative to his "banking game" allegation, to the extent there is any inconsistency between these allegations.

contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Gambling Websites and FanDuel Fantasy contests in California.

    f.    Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Gambling Websites and FanDuel Fantasy contests in California.

    g.    Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating the Gambling Websites and FanDuel Fantasy contests in California.

140.    FanDuel's operation of the Gambling Websites within California is also unlawful within the meaning of the UCL because FanDuel has violated the CLRA, as alleged in the Second Cause of Action, below.

141.    FanDuel's operation of the Gambling Websites within California is also unlawful within the meaning of the UCL because FanDuel has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

142.    The acts and practices of FanDuel as alleged herein also constitute "unfair" business acts and practices under the UCL because FanDuel's conduct is unconscionable, immoral,

deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of FanDuel's conduct outweighs any conceivable benefit of such conduct.

143.    FanDuel has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing operation of the Gambling Websites are lawful in California, when in fact, they are not, causing Plaintiff and the Class to be tricked out of tens of millions of dollars.

144.    Plaintiff and the Class have suffered injury in fact—in the form of all amounts paid to FanDuel and/or the total of net losses on the Gambling Websites run by FanDuel for bets placed within California—as a result of FanDuel's unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

145.    Plaintiff seeks all available remedies under the UCL, including an order providing restitution and/or disgorgement in the form of all amounts paid to FanDuel by Plaintiff and the Class and/or the total of net losses on the Gambling Websites by Plaintiff and the Class for bets placed within California.

146.    Plaintiff further seeks an order enjoining the unlawful practices.

147.    Plaintiff and members of the proposed Class have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendants' ill-gotten gains, and/or other sums as may be just and equitable.

148.    Plaintiff and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this UCL claim and this action.

**B.    Second Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, on Behalf of Plaintiff and the Class.**

149.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 135, inclusive, of this Complaint.

150.    At all relevant times, Plaintiff and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

151.    FanDuel's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through the Gambling Websites.

152.    FanDuel violated the CLRA by, among other things:

    a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

    b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

    c.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

    d.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

    e.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

    f.    "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

    g.    "Inserting an unconscionable provision in the contract" (a)(19).

153.    FanDuel's actions and misrepresentations were material, and FanDuel's violations of the CLRA were a substantial factor in causing Plaintiff and the Class to lose money.

154.    As a direct and proximate consequence of these actions, Plaintiff and the Class suffered injury.

155.    FanDuel's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and the Class for Defendants' own benefit to the detriment of Plaintiff and the Class.

156.    The CLRA provides robust enforcement tools for consumers, including:

a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c.    Establishing a substantive right to litigate in the forum where the transaction occurred and/or where the consumer lives. *Id.* § 1780(d).

d.    Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

e.    Authorizing injunctive relief. *Id.* § 1780(a)(2)

f.    Authorizing actual damages. *Id.* § 1780(a)(1).

g.    Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h.    Authorizing punitive damages. *Id.* § 1780(a)(4).

i.    Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j.    Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k.    Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

157.    Plaintiff seeks all available remedies under the CLRA, except that, at this time, Plaintiff does not seek any monetary damages for his CLRA cause of action.[45]

**C.    Third Cause of Action: Declaratory Judgment, 28 U.S.C. § 2201, on Behalf of Plaintiff and the Class.**

158.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 135, inclusive, of this Complaint.

159.    The Declaratory Judgement Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

160.    An actual, present, and justiciable controversy has arisen between Plaintiff and the Class (on the one hand) and FanDuel (on the other hand) regarding whether: (1) FanDuel's operation of the Gambling Websites within California, including FanDuel Fantasy, violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j; (2) FanDuel's contracts with Plaintiff and the Class (to the extent any were formed) are void or voidable, including, without limitation, pursuant to California Civil Code Section 1667; (3) the applicable statute of limitations for claims raised by Plaintiff and the Class;[46] and (4) Plaintiff and the Class are required to pursue their claims in small claims court.

161.    Plaintiff seeks a declaration in his favor on behalf of himself and the Class that: (1) FanDuel's operation of the Gambling Websites within California, including FanDuel Fantasy,

---

[45] Pursuant to Section 1782(d) of the CLRA, Plaintiff expressly reserves his right to amend the CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing FanDuel the notice contemplated by Section 1782(a).

[46] In its Terms of Use, FanDuel contends that any claims against it are subject to a one-year statute of limitation period. Fan Duel Terms of Use Dated April 28, 2025 at ¶ 18.3, available online at https://www.fanduel.com/terms (last visited June 30, 2025). Plaintiff, as detailed in Section V.G below, contends that all statutes of limitations periods have tolled, and alternatively, Plaintiff states that the applicable statute of limitations period is four years for claims arising under California's unfair competition law (First Cause of Action, above) and three years for claims arising under California's Consumer Legal Remedies Action (Second Cause of Action, above), not one year, as claimed by FanDuel. Accordingly, a present dispute exists between Plaintiff and FanDuel as to the applicable limitations period.

-42-

violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j; (2) FanDuel's contracts with Plaintiff and the Class (to the extent any were formed) are void or voidable, including, without limitation, pursuant to California Civil Code Section 1667; (3) the applicable statute of limitations for claims raised by Plaintiff and the Class has been tolled since the inception of FanDuel's commencement of operations in California and/or in the alternative, that Plaintiff's and the Class's First Cause of Action is subject to a four year limitations period and their Second Cause of Actions is subject to a three year limitations period; and (4) Plaintiff and the Class are not required to pursue their claims in small claims court.

## VIII.    PRAYER FOR RELIEF

162.    Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a.    Certifying the proposed Class pursuant to Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b.    Declaring that FanDuel is financially responsible for notifying the Class members of the pendency of this suit;

c.    Finding that FanDuel has committed the violations of law alleged herein;

d.    Declaring and resolving the disputed points raised in the Third Cause of Action;

e.    Providing for any and all injunctive relief the Court deems appropriate;

f.    Awarding monetary relief, including but not limited to restitution in an amount that the Court or jury will determine, in accordance with applicable law;

g.    Providing for any and all other monetary relief the Court deems appropriate;

1                h.     Awarding Plaintiff his reasonable costs and expenses of suit,

2                  including attorney's fees;

3                i.     Awarding pre- and post-judgement interest to extent the law allows;

4                j.     Providing such further relief as this Court may deem just and proper.

5 Respectfully submitted,

6

7 Dated: July 2, 2025                    By:   */s/ Wesley M. Griffith*
                                   Wesley M. Griffith, SBN 286390

8                                    **ALMEIDA LAW GROUP LLC**
                                   111 W. Ocean Blvd, Suite 426

9                                    Long Beach, CA 90802
                                   Telephone: 310-896-5813

10                                    E-mail: wes@almeidalawgroup.com

11                                    Margot Cutter, SBN 306789
                                   **CUTTER LAW P.C.**

12                                    401 Watt Avenue
                                   Sacramento, CA 95864

13                                    Telephone: 916-290-9400
                                   E-mail: mcutter@cutterlaw.com

14                                    F. Peter Silva II Aizpuru, SBN 348070

15                                    Katherine M. Aizpuru, *pro hac vice* to be filed
                                   Robert M. Devling, *pro hac vice* to be filed

16                                    **TYCKO & ZAVAREEI LLP**
                                   2000 Pennsylvania Avenue, NW, Suite 1010

17                                    Washington, District of Columbia 20006
                                   Telephone: 202-973-0900

18                                    E-mail: psilva@tzlegal.com
                                   E-mail: kaizpuru@tzlegal.com

19                                    E-mail: rdevling@tzlegal.com

20                                    James Bisborrow, *pro hac vice* to be filed
                                   Aaron Freedman, *pro hac vice* to be filed

21                                    **WEITZ & LUXENBERG PC**
                                   700 Broadway

22                                    New York, NY 10003
                                   Telephone: 212-344-5461

23                                    E-mail: jbilsborrow@weitzlux.com
                                   E-mail: afreedman@weitzlux.com

24                                    Christopher Nienhaus, *pro hac vice* to be filed

25                                    **ALMEIDA LAW GROUP LLC**
                                   849 W. Webster Ave

26                                    Chicago, IL 60614
                                   Telephone: 708-529-5418

27                                    E-mail: chris@almeidalawgroup.com

28                                  *Counsel for Plaintiff and the Proposed Class*

-44-

1

### IX.    DEMAND FOR TRIAL BY JURY

2        Plaintiff, on behalf of himself and the putative Class, hereby respectfully demands a trial by

3    jury on all claims for which a jury trial is available.

4

Dated: July 2, 2025                    By:  */s/ Wesley M. Griffith*
5                                        Wesley M. Griffith, SBN 286390
                                         **ALMEIDA LAW GROUP LLC**
6                                        111 W. Ocean Blvd, Suite 426
                                         Long Beach, CA 90802
7                                        Telephone: 310-896-5813
                                         E-mail: wes@almeidalawgroup.com
8
                                         Margot Cutter, SBN 306789
9                                        **CUTTER LAW P.C.**
                                         401 Watt Avenue
10                                       Sacramento, CA 95864
                                         Telephone: 916-290-9400
11                                       E-mail: mcutter@cutterlaw.com

12                                       F. Peter Silva II Aizpuru, SBN 348070
                                         Katherine M. Aizpuru, *pro hac vice* to be filed
13                                       Robert M. Devling, *pro hac vice* to be filed
                                         **TYCKO & ZAVAREEI LLP**
14                                       2000 Pennsylvania Avenue, NW, Suite 1010
                                         Washington, District of Columbia 20006
15                                       Telephone: 202-973-0900
                                         E-mail: psilva@tzlegal.com
16                                       E-mail: kaizpuru@tzlegal.com
                                         E-mail: rdevling@tzlegal.com
17
                                         James Bisborrow, *pro hac vice* to be filed
18                                       Aaron Freedman, *pro hac vice* to be filed
                                         **WEITZ & LUXENBERG PC**
19                                       700 Broadway
                                         New York, NY 10003
20                                       Telephone: 212-344-5461
                                         E-mail: jbilsborrow@weitzlux.com
21                                       E-mail: afreedman@weitzlux.com

22                                       Christopher Nienhaus, *pro hac vice* to be filed
                                         **ALMEIDA LAW GROUP LLC**
23                                       849 W. Webster Ave
                                         Chicago, IL 60614
24                                       Telephone: 708-529-5418
                                         E-mail: chris@almeidalawgroup.com
25
                                         *Counsel for Plaintiff and the Proposed Class*
26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL